IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF ILLINOIS
                              EASTERN DIVISION

DARRYL W. JACKSON, et al.,          )
                                    )
                Plaintiffs,         )
                                    )
        v.                          )       No.  06 C 3676
                                    )
PAUL CERPA, et al.,                 )
                                    )
                Defendants.         )

                    MEMORANDUM OPINION AND ORDER

        DWJ Petroleum ("DWJ") and its owner Darryl Jackson

(collectively "Jackson," treated after this sentence as a

singular noun) have brought this action against the Illinois

Department of Transportation ("Department"), former Department

employees Paul Cerpa ("Cerpa") and Gilbert Villegas ("Villegas")

and former Department Secretary Timothy Martin ("Martin").

Jackson claims that Cerpa, Villegas and Martin (1) intentionally

discriminated against him in their individual capacities in

violation of 42 U.S.C. §1983[1] and (2) interfered with his

contractual rights and prospective economic advantage in

violation of Illinois common law.  Jackson also claims that

Department intentionally discriminated against him in violation

of Title VI of the Civil Rights Act of 1964 (Section 2000(d)).[2]

_____

        [1] Further references to Title 42 provisions will take the
form "Section --."

        [2] Jackson had also claimed that Department subjected him to
disparate impact discrimination, but that claim has earlier been
dismissed by this Court's March 19, 2010 order.

All defendants have moved for summary judgment on all remaining counts pursuant to Fed. R. Civ. P. ("Rule") 56.[3]  For the reasons stated below, their motion is granted in part and denied in part.

## Standard of Review

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).  For that purpose courts consider evidentiary records in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)).  What follows in the **Factual Background** section, then, is a summary of the facts viewed from a pro-Jackson perspective.

But to avoid summary judgment a nonmovant must produce more than "a mere scintilla of evidence" to support his position that a genuine issue of fact exists (Wheeler v. Lawson, 539 F.3d 629, 634 (7th Cir. 2008)) and "must come forward with specific facts demonstrating that there is a genuine issue for trial" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v.

---

[3] This opinion identifies Jackson's and defendants' respective submissions as "J." and "D.," followed by appropriate designations:  LR 56.1 statements and supplements as "St.--" and "St. Supp. --", responses and supplemental responses as "Resp. --" and "Supp. Resp. --" and memoranda, responses and surreplies as "Mem.--," "Sur. Mem.--" and "R. Sur. Mem.--."

<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).

## Factual Background

Jackson, an African-American man, is the sole owner, employee and shareholder of DWJ Petroleum, Inc., an Illinois business incorporated in 2001 (D. St. ¶¶2-3). As a minority small business owner, Jackson was eligible to participate as a certified Disadvantaged Business Entity ("DBE") in an affirmative action contracting program administered by Department (J. Resp. 1, 3). Department's DBE program, the constitutionality of which was upheld in <u>Northern Contracting, Inc. v. Ill.</u>, 473 F.3d 715 (7th Cir. 2007), exists as part of a United States Department of Transportation regulatory scheme affecting all federally-funded highway projects (J. Resp. 3-4). Jackson's complaint arises from events taking place in 2005,[4] following his bid to perform subcontractor work on one such federally-funded program: Department's reconstruction of the Dan Ryan Highway (D. St. ¶¶7-23).

Described by Martin in his affidavit as "the most costly highway reconstruction project in IDOT's history," the Dan Ryan project involved portions of Interstates 90 and 94 running through the south side of Chicago, a predominantly African-American community (D. St. ¶13). As such, the project was

_____

[4] Accordingly no year reference will be included as to events in 2005.

subject to scrutiny from elected community representatives and activists who wished to maximize African-American participation through the DBE program (id. ¶14).

Department divided the Dan Ryan project into numerous separate contracts that it put out to bid, and Walsh Construction ("Walsh") was the winning bidder on two contracts covering the northbound and southbound express lanes (the "1X/2X project")(D. St. ¶¶18-19). As the prime contractor on a federally funded project, Walsh had to meet the project's DBE participation goals by allocating a sufficient amount of work to DBE subcontractors (id. ¶¶7-8). About October 31 Walsh submitted its DBE utilization plans ("U-Plans") to Department, identifying Jackson as the proposed subcontractor tasked with furnishing and installing reinforced steel rebar in concrete pavement for a total price of $7.2 million (id. ¶¶21-23, J. Resp. 5). Although Jackson was Department-certified in "Miscellaneous Concrete," he was not certified to do rebar work and had never before purchased rebar (D. St. ¶¶33-34).

In early November Cerpa and Villegas became aware of the U-Plan that included Jackson (D. St. ¶35, Ex. D, J. Resp. 5).[5] Several e-mail exchanges took place among the two and other

[5] At that time Cerpa was director of Department's Office of Business and Workforce Diversity and Villegas was employed within that division. Cerpa, as director, oversaw the DBE program, while Villegas was responsible for providing support services to DBEs named in a given U-Plan (D. St. Exs. C, D).

Department employees and consultants. On November 7 Villegas told Cerpa in an email that Jackson "hit the lotto with a 17 [sic] million dollar contract on the u-plan" (J. Resp. 5). Cerpa responded, saying "that firm isn't gonna work if its DMJ [sic] Petroleum" and stating that "CTA denied this firm fronting for a petroleum mogul" (id. 5-6).[6]

Around that time Jackson was required to attend a meeting with Department's supportive services (id. 6-7).[7] Villegas met with Jackson at Department's Resource Center, "where he put Jackson in touch with one of IDOT's technical consultants" (id.). After that meeting Villegas told Mark Bennett ("Bennett"), another Department employee, that Jackson "can not bankroll this project" and "we got to nip this and get some proven DBE's [sic] in there" (J. Supp. Resp. 10). Two days later Cerpa wrote to Bennett that "DWJ and Rohar[8] I'm certain are destined to follow the same fate of the others [sic] inability to perform" (id. 5).

_____

[6] That prior denial involved Cerpa, who was at the time employed at the Chicago Transit Authority ("CTA"). At CTA Cerpa denied Jackson's application for DBE certification, prompting Jackson to file a complaint with the United States Department of Transportation (D. St. Ex. A at 268, 271-72).

[7] Cerpa and Villegas maintain that the meeting was not required but that they merely "contacted the DBEs to ensure that they knew of and could make full use of the various services available at IDOT's Resource Center, a facility that IDOT made available to individuals and businesses seeking to participate in the Department's DBE program" (D. St. ¶36).

[8] Rohar was the only other African-American-owned DBE listed on Walsh's original 1X/2X U-Plan (J. Supp. Resp. 6).

But Carol Lyle ("Lyle"), Cerpa's subordinate in charge of assessing U-Plans and administering the DBE program, told fellow employee Bennett--and possibly Villegas and Cerpa--that in her opinion Jackson should be approved to work on the 1X/2X project (J. Resp. 9).

On November 28 Villegas followed up with Jackson regarding their meeting at the Resource Center and asked Jackson to submit a work plan and breakdown of his bid unit pricing "as soon as possible" (J. Supp. Resp. Ex. L at 2). That information is not normally required of other DBEs (J. Resp. 6-7). On November 29 both Villegas and Cerpa wrote repeatedly to Department's support services consultants, requesting information about Jackson's (and Rohar's) work plans, managerial experience, resources and capacity (J. Supp. Resp. Ex. L at 1, 3-4; J. Resp. 6).

Approximately one month after Walsh had submitted the U-Plan listing Jackson as a DBE, Cerpa told Villegas and other subordinates that in his opinion Jackson should not be approved (J. Resp. 9). By his own admission, Cerpa lacked the authority either to approve or to disapprove the DBE (id.). On that same day Bennett speculated to Villegas that Walsh would replace Jackson with a white-woman-owned DBE, stating that "we are in uncharted and shark infested waters" because "we left the

security of the regulations as a map" (J. Resp. 8).[9]

Events came to a head in a telephone conference call (date unknown) involving several Department employees (including Martin, Bennett, Lyle and possibly Cerpa), Walsh Vice President Steven Kehle ("Kehle") and Walsh Program Manager David Shier ("Shier")(D. St. ¶45, D. Sur. Mem. 5). Department asserts that Walsh was asked to reduce the size of Jackson's subcontract, a suggestion that Walsh rejected as not feasible (D. Mem. 3). But Shier's testimony does not support Department's version.[10] In any event, by the end of the call Walsh understood that their U-Plan would not be approved with Jackson as a DBE subcontractor performing rebar work (D. St. ¶47).[11]

Lyle has testified that had Jackson not been subjected to the additional scrutiny described above, there is a "strong likelihood" that he would have been approved as a DBE subcontractor on the 1X/2X project (J. Resp. 8). Defendants

---

[9] It seems clear that Cerpa and Villegas did not adhere to Department's Policy and Procedure Manual ("Manual") in handling their concerns with Jackson (J. Supp. Resp. 11).

[10] During the call Shier told Martin that Walsh was comfortable with Jackson and that Walsh thought Jackson could do the work with its help (J. Supp. Resp. Ex. E at 42). Shier testified that the call nevertheless concluded with Walsh being told it "need[ed] to resubmit the utilization plan without DWJ" (id.). Shier's version is credited here.

[11] Defendants assert that Walsh was free to use Jackson as a subcontractor but that such use "would not count towards Walsh's DBE participation goals on the 1X and 2X projects" (D. St. Ex. B at 14).

concede that Jackson's participation in the U-Plan received "extra scrutiny," but they assert that it was due to their concerns about his qualifications (D. Mem. 2-3). Walsh, on the other hand, believed that installing rebar "was not difficult work" (D. St. Ex. G at 78), and Kehle testified that rebar installation was "something that could easily be picked up and a skill that could be quickly learned" because it was "primarily laborer work...bull work" performable by unskilled laborers (D. St. Ex. H at 61).[12] Bennett held similar views, telling Cerpa and Villegas that "DWJ's portion [of the contract] is pretty straightforward, labor only" (J. Supp. Resp. 4) and that "[t]his is not difficult work..." (J. Resp. Ex. I at 5).

In addition to the timeline of events surrounding Department's denial of the U-Plan containing Jackson, the record contains several other relevant facts speaking to defendants' asserted racial animus. First, Cerpa is said to have referred to Jackson as a "pimp" (D. Mem. 6) or possibly a "nigger pimp" (D. Sur. Mem. Ex. A at ¶26) at some point, though that assertion does

---

[12] It is true that Kehle admitted that he was "not confident" that Jackson would be approved to do the rebar work given Jackson was not certified in rebar, but Walsh thought "it might be acceptable to use [Jackson]" because the rebar work at issue involved concrete paving (D. St. Ex. H at 23). Kehle also testified that his "instinct was that we submitted [Jackson] because we felt that his certification would--was enough coverage to do the work, the reinforcement required, and because he was an African-American company, that it would get approved. And I was surprised when it didn't" (D. St. Ex. H at 66-67).

not speak to the date or context for that utterance.  Second, evidence is offered that Villegas and Cerpa orchestrated the termination of Brenda Gold, a long-time African-American EEO officer, for racially discriminatory reasons (J. Supp. Resp. 9 and Ex. N at 11).  Finally, there is testimony that Villegas and Cerpa pursued a "Hispanic agenda" (D. Mem. 7) while at Department:  Current Department employee Dante Buonaguide testified to such a practice generally (id.), and Gold testified that Villegas coached a prospective Hispanic employee in preparation for her job interview at Department (J. Supp. Resp. Ex. O at 101).

## Equal Protection and Title VI Claims

Jackson claims his removal from the U-Plan and consequent exclusion from the Dan Ryan project was the result of intentional discrimination in violation of (1) his Fourteenth Amendment equal protection rights (Count I) and (2) Title VI of the Civil Rights Act of 1964 (Count III).[13]  As Regents of Univ. of Cal. v. Bakke, 438 U.S. 265, 287 (1978) makes clear, "Title VI must be held to proscribe only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment."  So a finding that Jackson has presented sufficient issues of disputed fact to maintain his equal protection claim also mandates a

---

[13] Jackson's Section 1983 claims are brought against Cerpa, Villegas and Martin in their individual capacities; his Title VI claim is against Department.

finding that his Title VI claim survives the current motion (cf.

<u>Williams v. Wendler</u>, 530 F.3d 584, 586 (7th Cir. 2008)).[14]

As a prefatory matter, defendants argue that Jackson's claim is one for which no private right of action exists under Section 1983, citing <u>Indianapolis Minority Contractors Ass'n, Inc. v. Wiley</u>, 187 F.3d 743 (7th Cir. 1999). But <u>Wiley</u> involved an attempted claim under Section 1983 that the Indiana Department of Transportation had violated various federal transportation statutes and regulations, which our Court of Appeals properly found conferred no private right of action (<u>id</u>. at 750-52). In contrast, Jackson claims that the individual defendants have violated his constitutional rights, not some statutory scheme.

---

[14] As for Jackson's Title VI claim, it is advanced only against Department and not against Cerpa, Villegas and Martin individually. Although our Court of Appeals has not spoken to the standard for holding a Title VI recipient liable when the claim for damages is based on the behavior of the recipient's employees, it has done so in the context of Title IX, the language of which is nearly identical to that in Title VI. As <u>Delgado v. Stegall</u>, 367 F.3d 668, 671 (7th Cir. 2004)(internal quotation marks, brackets and ellipses in the original omitted) has held regarding Title IX:

> When, however, the claim for damages is based on the behavior of...some other employee of the Title IX recipient, the plaintiff must prove that an official of the defendant educational institution who at a minimum has authority to institute corrective measures has actual notice of, and is deliberately indifferent to, the teacher's misconduct.

Here two defendants, Martin (who was Secretary at the time) and Cerpa (as director of the Department division responsible for administering the DBE program), were Department officials with authority to take corrective measures. Thus if Jackson's equal protection claim survives, so must his Title VI claim.

Though he alleges that the defendants failed to follow procedures, that allegation simply supports his constitutional claim and is not the claim itself. Thus defendants' argument on that count is flawed, resting as it does on a mischaracterization of Jackson's claims.[15]

**Indirect Burden-Shifting Method**

To avoid summary judgment on his equal protection claims, Jackson must "point to enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue (the "direct" method) or establish a prima facie case under the <u>McDonnell</u>-<u>Douglas</u> formula (the "indirect" method)" (<u>Egonmwan v. Cook County Sheriff's Dep't</u>, 602 F.3d 845, 849-50 (7th Cir. 2010)). Here Jackson has proffered evidence under both approaches. This opinion need not address Jackson's arguments as to the first approach, because he has presented sufficient issues of fact under the indirect method to allow his claims to survive in principal part.[16]

---

[15] Defendants' stated justification for its belated citation of <u>Wiley</u> via its March 24, 2010 motion for leave to supplement rests on shaky footing. That motion describes <u>Wiley</u>, a decade-old case, as one that defense counsel had only newly discovered--but counsel had cited that selfsame case in their surreply memorandum, filed only a few weeks earlier, on March 5.

[16] On the current Rule 56 motion, of course, Jackson's burden is one of production, not proof, and he need only demonstrate the existence of genuine issues of material fact. But because much of the caselaw speaks of what a nonmovant must "establish," "prove" or "show," this opinion will follow the same practice--but it imposes on Jackson only the lesser burden

## 1. **Prima facie case**

Under the first step of the familiar <u>McDonnell</u>-<u>Douglas</u> burden-shifting analysis, plaintiffs must establish a prima facie case of racially motivated discrimination (<u>McDonnell</u>-<u>Douglas Corp. v. Green,</u> 411 U.S. 792 (1973)). To that end it is necessary to adapt the most commonly encountered formulation of the prima facie case to fit the current context.

Defendants contend that the prima facie case articulated in <u>Chavez v. Ill. State Police</u>, 251 F.3d 612, 635-36 (7th Cir. 2001) should apply here. That framework requires a plaintiff to show the existence of a similarly situated comparator, and defendants argue that Jackson's lack of a comparator is fatal to his case. But <u>McDonnell</u>-<u>Douglas</u> did not itself require a comparator,[17] and in any event it also observed that its particular prima facie elements are "not necessarily applicable in every respect to differing factual situations" (411 U.S. at 802 n.13). And as the Court later made clear in <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981), the prima facie burden "is not onerous."

---

described in this footnote.

[17] <u>McDonnell</u>-<u>Douglas</u>' prima facie elements are "(i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications" (411 U.S. at 802).

Though our own Court of Appeals has not articulated the appropriate elements of a prima facie case in the context of public bidding, two other circuits have. Both adapted the McDonnell-Douglas formulation for use in a factual context similar to--but different in one critical aspect from--this case.[18] T & S Serv. Assocs., Inc. v. Crenson, 666 F.2d 722, 725 (1st Cir. 1981) requires plaintiffs alleging discrimination in the awarding of contracts to show that (1) they are minority-owned, (2) their bids met the specifications required to compete for a contract, (3) their bids were "significantly more advantageous" to defendant than that of the winning bidder and (4) defendant selected another contractor. Brown v. Am. Honda Motor Co., 939 F.2d 946, 949 (11th Cir. 1991) outlined a like test, but one under which the plaintiff need show only that its bid "met the requirements for an available contract."

Quite apart from the marked difference between those circuits' requirements, neither of them fits the current scenario at all comfortably. Here Jackson was a subcontractor who was totally acceptable to the principal contractor, whose bid and qualifications were in turn totally acceptable to the party letting the contract: Department.[19] With Jackson concededly

---

[18] Both cases dealt with claims under Section 1981.

[19] In both T&S and Brown the conflict was between the bidtaker and the bidding contractor, so that those cases necessarily scrutinized the dispute in terms of that bidding

13

meeting the first two elements of the conventional prima facie case,[20] what has been said here, when coupled with the fact that Department forced the contractor to abandon its own choice of Jackson in favor of another subcontractor, should suffice in prima facie terms. That then shifts the burden to Department to articulate a non-race-based explanation for its conduct.[21]

As frequently happens, that articulation by Department is at odds with the second element of the prima facie case. And so it is not unusual for the caselaw to conflate that component of the prima facie case analysis with examination of the last step in the McDonnell-Douglas quadrille--the question of pretext (see, e.g., Olsen v. Marshall & Ilsley Corp., 267 F.3d 597, 600-01 (7th Cir. 2001)). This opinion turns, then, to that subject.

## 2. Pretext

Cerpa, Villegas, Martin and Department all point to Jackson's lack of certification in rebar and inexperience as the rationale for rejecting his participation in the U-Plan. And it is undisputed that Jackson was not certified as a DBE in the

---

relationship. That is clearly not the case here.

[20] As n.16 calls for, what is being said in this paragraph reflects Jackson's establishment of genuine factual issues for Rule 56 purposes.

[21] This formulation, which deals with the subcontractor situation as the two Court of Appeals' decisions do not, is closer to the Brown modification of the usual McDonnell-Douglas elements than the T&S version, which on its face does not even come close to fitting this case.

category of rebar and that he had never before furnished or
installed rebar.  Defendants contend that because of the size and
high profile nature of the Dan Ryan project, both concerns
regarding Jackson's capacity to do the job were legitimate.[22]

Forrester v. Rauland-Borg Corp., 453 F.3d 416, 418 (7th Cir.
2006) teaches that "the question is never whether the employer
was mistaken, cruel, unethical, out of his head, or downright
irrational in taking the action for the stated reason, but simply
whether the stated reason was his reason: not a good reason, but
the true reason."  Because defendants' stated rationale is
supported in the record--Jackson was indeed not certified in
rebar and he did not have much experience--what remains is
whether Jackson has shown that in pointing to those factors
Cerpa, Villegas and Martin were really advancing a cover story to
mask a race-biased decision (Jordan v. Summers, 205 F.3d 337, 343
(7th Cir. 2000)).

For the reasons discussed below, this Court concludes that
Jackson has presented enough evidence to rebut defendants'
contentions as to Cerpa and Villegas so that a reasonable
factfinder could draw an inference of discriminatory motive on

---

[22] Defense counsel urge that Walsh, not defendants, made the
decision to remove Jackson from the U-Plan.  But Jackson has
expressly shown that Walsh did so only under the pressure of
being told the U-Plan would not be approved with Jackson in it.
That patently groundless argument reflects no credit on defense
counsel.

their parts.  That, however, is not true as to Martin.

### a. Claims Against Cerpa and Villegas

First, Jackson has produced evidence to undercut the legitimacy of Cerpa's and Villegas' stated concerns as to his ability to perform rebar work.  On that score he has presented evidence that Walsh believed both that Jackson was capable of doing the work and that Jackson's participation would satisfy some of the political concerns surrounding the Dan Ryan project. Bennett too believed Jackson was qualified for what he described as "straightforward" work involving "labor only" (P. Supp. Resp. 4).  Moreover, Lyle, the Department employee tasked with assessing U-Plans and administering the DBE program, thought it very likely that Jackson would have been approved but for defendants' actions.  And no evidence has established that Cerpa and Villegas had the knowhow to counter the beliefs held by Walsh and Bennett.  Based upon all the evidence, a factfinder could reasonably conclude that Cerpa and Villegas did not actually believe Jackson incapable of doing the work.

Second, Jackson has pointed to evidence that Cerpa and Villegas did not follow internal Department procedures for dealing with subcontractors that are not certified to perform work in a given category (J. Supp. Resp. 11).  Defendants concede that Jackson received "extra scrutiny" (D. Mem. 2), and internal Department emails reveal that Bennett warned Villegas and Cerpa

16

to "be cautious of setting up a prequalification or a different standard for this contractor as we have for others," noting that "the amount of scrutiny we have expended is unprecedented" (J. Resp. 7).[23]  Indeed, the evidence shows that Cerpa's prediction that Jackson would be unable to perform came a mere two days after the Resource Center meeting during which Department sought to evaluate Jackson's capabilities--a time when Department's support services consultants had not yet completed their evaluation of Jackson.  Again a reasonable factfinder could conclude that Cerpa and Villegas had made up their minds about Jackson before knowing anything about his business.

Third, there is also evidence that Cerpa's and Villegas' assigned reason was "discriminatory in its application" (McDonnell-Douglas, 411 U.S. at 807).  Their stated concern was the ability of DBEs to perform on such a large-scale high profile project as the Dan Ryan reconstruction, yet they did not scrutinize all DBEs identified on the Walsh U-Plan.  Instead Cerpa and Villegas required only the two African-American firms (DWJ and Rohar) to demonstrate their capabilities in ways not required of other DBEs.  For example, Steppo (the white-woman-

---

[23] Despite defendants' protestations, the binding or non-binding nature of the Manual is immaterial at this stage. According to the Manual, "IDOT has the responsibility to implement these procedures in a consistent and timely manner" (J. Resp. Ex. C at 7).  At a minimum it is clear that the Manual provides "guidance and direction" (id.) to ensure procedural consistency.

owned DBE that replaced Jackson on the U-Plan) had but a single
"informational" meeting at Department (D. St. Supp. Ex. A at 28),
in which Steppo owner Eileen Stepanovich ("Stepanovich")
discussed her contract application and her proposed rates of
minority and female worker participation (id. at 27-28, 46).
There is no indication that Cerpa and Villegas asked Stepanovich
to provide information about her pricing, managerial experience,
resources or capacity.  In other words, she received less
scrutiny than Jackson.

Fourth, defendants claim a proposed out on the basis that
they did not tell Walsh it could not use Jackson as a
subcontractor on the 1X/2X project, only that Walsh would not get
DBE credit for Jackson's participation (D. St. ¶¶46-47).  But
that of course ignores the reality of the DBE program.  As
Jackson correctly observes, the DBE program exists to encourage
prime contractors to hire DBE subcontractors even if the job
could be done more cheaply using in-house resources, as is often
the case (J. Supp. Resp. 9).

Finally, there is the earlier-recounted additional evidence
of racial animus--Cerpa's use of a racially-tinged epithet (and
possibly his use of an even more egregious term), his and
Villegas' alleged orchestration of the firing of a long-time
African American employee and allegations that both men pursued a
"Hispanic agenda" while at Department.  That evidence further

bolsters Jackson's claims that Cerpa and Villegas acted as they did not because of his lack of certification and experience but instead because of his race.

There is no need to go further. On the record Jackson has at least shown sufficient issues of disputed fact to survive summary judgment on his claims against Cerpa and Villegas.

### b. Claims Against Martin

But the same analysis does not apply as to Martin's role. Defendants rightly point out that Jackson cannot prevail under a theory of respondeat superior liability (D. Sur. Mem. at 5-6). Theories of vicarious liability (Kinslow v. Pullara, 538 F.3d 687, 692 (7th Cir. 2008)) and negligence, even gross negligence (Lanigan v. Vill. of E. Hazel Crest, 110 F.3d 467, 477 (7th Cir. 1997)), are similarly inadequate. Although direct participation on Martin's part is not necessary, Jackson must show that he was personally involved in the deprivation of Jackson's rights (see, e.g., Palmer v. Marion County, 327 F.3d 588, 594 (7th Cir. 2003)) and that he acted "either knowingly or with deliberate, reckless indifference" (Jones v. City of Chicago, 856 F.2d 985, 992-93 (7th Cir. 1988)).

Those requirements have not been met. Jackson offers no evidence of Martin's personal involvement in the alleged racially discriminatory treatment that he experienced, and he proffers no evidence or theories upon which this Court might find triable

issues of fact as to Martin's liability for actions in his supervisory capacity. Although Jackson notes that Lyle described Martin's managerial style as that of an interventionist, a fact that (if true) would permit the inference that Martin should have been aware of Cerpa and Villegas' behavior, that can amount to no more than negligence--a state of mind insufficient to support Section 1983 liability (see, e.g., <u>Lanigan</u>, 110 F.3d at 477). There is simply no evidence relating to Martin's knowledge, approval or reckless disregard of Villegas' and Cerpa's conduct leading up to the conference call during which Martin made clear that the U-Plan would not be approved if it included Jackson.

     c.  <u>**Summary**</u>

On the record as presented, then, Jackson has met his burden of raising triable issues of fact as to Cerpa's and Villegas' intent to discriminate against him, but he has not met that burden as to Martin. Defendants' motion for summary judgment is therefore granted on Count I as to Martin but denied as to Cerpa and Villegas. Defendants' motion as to Count III, the Title VI claim against Department, is also denied.

**State Law Claims**

Cerpa, Villegas and Martin have also moved for summary judgment on Jackson's claims against them under Illinois tort law (Count II). Jackson claims defendants interfered with his

prospective economic advantage.[24]

Defendants challenge Jackson's claims on two fronts. First, they argue that Jackson's inclusion in the U-Plan did not represent either a valid business relationship or a valid business expectancy and that they did not purposefully interfere with any such expectancy. Both are required elements of the torts at issue.[25] Second, defendants contend that this Court lacks jurisdiction over the state law claims because the State of Illinois is the real party in interest and the individual defendants are protected from liability by Illinois public officials' immunity.

As to the first argument, Jackson has pointed to evidence indicating that he had at least a valid business expectancy in the U-Plan and that the defendants' interference with that

_____

[24] Jackson's claim as stated is for interference with contract or, in the alternative, interference with prospective economic advantage. It is not clear whether Walsh's initial inclusion of Jackson as its proposed subcontractor to do the rebar work on the Dan Ryan project is sufficient to establish a viable contractual relationship--a relationship that would afford him greater protections than a prospective business advantage. For purposes of the textual analysis, then, this opinion will consider only whether Jackson has shown sufficient issues of disputed fact to allow the latter claim--the prospective one--to survive.

[25] Those torts require four elements: that (1) a valid business relationship or expectancy exists, (2) defendants have knowledge of it, (3) defendants purposefully interfere with it, causing its termination (in the case of a relationship) or preventing it from ripening (in the case of an expectancy) and (4) plaintiff suffers damages (Fellhauer v. City of Geneva, 142 Ill. 2d 495, 511, 568 N.E.2d 870, 878 (1991)).

expectancy was purposeful. Jackson submitted a bid to Walsh and
Walsh accepted that bid, necessarily reflecting Walsh's belief
that Jackson was qualified to perform the work despite his lack
of certification in rebar. That acceptance, when read in
Jackson's favor, certainly confirms a valid business expectancy
for the rebar work. And as recounted earlier, Jackson has
provided evidence that Cerpa, Villegas and Martin interfered with
the realization of that business expectancy by acting to have him
removed from the U-Plan. Arguments to the contrary by defendants
impermissibly ask this Court to read the facts in <u>their</u> favor.

Defendants' Eleventh Amendment argument, however, bears a
closer look at precisely what Jackson's claims represent. Claims
against Illinois officials cannot proceed in the federal courts
where the state is the real party in interest (<u>Feldman v. Ho</u>, 171
F.3d 494, 498 (7th Cir. 1999)). But the question whether the
state is the real party in interest is a nuanced one, as <u>Currie</u>
<u>v. Lao</u>, 148 Ill.2d 151, 159, 592 N.E.2d 977, 980 (1992) (internal
citations omitted) teaches:

> In other words, where an employee of the State,
> although acting within the scope of his employment, is
> charged with breaching a duty that arose independently
> of his State employment, a suit against him will not be
> shielded by sovereign immunity.

If then the duty to avoid interfering with another's
business opportunities is one imposed on Cerpa, Villegas and
Martin as individuals, Jackson's claim survives their Rule 56

motion.  If that duty, though, is imposed only by their roles as
Department officials, their motion must be granted as to
Jackson's state law claims.

Under Illinois law a business relationship or prospective
business advantage is a property right (see <u>Belden Corp. v.</u>
<u>InterNorth, Inc.</u>, 90 Ill. App. 3d 547, 551, 413 N.E.2d 98, 101
(1st Dist. 1980)).  And with respect to that property right, "an
individual has a general duty not to interfere in the business
affairs of another" (<u>id</u>.).  That suggests that the duty at issue
here is not one imposed on Cerpa, Villegas and Martin just by
virtue of their employment with Department.  True enough, their
employment made it <u>possible</u> to interfere, but that is not the
same thing.

<u>Belden</u>, <u>id</u>. also notes that an individual "may be privileged
to interfere, depending on his purpose and methods, when the
interference takes a socially sanctioned form, such as lawful
competition."  But that "competitor's privilege" is not at issue
here--Department was not in competition with Jackson.[26]  Indeed,
as defendants repeatedly argue throughout the rest of their
presentation, Department was the customer.

Of course, in making that argument defendants contend that
their mandating Jackson's removal from the U-Plan for being

---

[26] Defendants do not suggest any claimed alternative
privilege that might excuse their actions.

unqualified did nothing more than exercise their official discretion--the foundation of any sovereign immunity argument. But Jackson has provided record evidence indicating that Cerpa and Villegas acted outside the scope of their authority--indeed, Villegas and Cerpa both testified that they had no role in approving DBEs, and it is undisputed that they "left the security of the regulations as a map" (J. Resp. 8). And Martin testified that "no employee shall...direct any contractor to use any sub...or not to use any sub...because that would be a violation of state procurement law" (J. R. Sur. Mem. Ex. E at 99).

As Feldman v. Ho, 171 F.3d at 498 reconfirmed by quoting from an Illinois case "that is almost the clone of ours":

> Whenever a state employee performs illegally, unconstitutionally or without authority, a suit may be maintained against the employee in his individual capacity and does not constitute an action against the State of Illinois.

As detailed above, Jackson has adduced sufficient record evidence that, read in the Rule-56-mandated light most favorable to him, (1) Cerpa and Villegas acted unconstitutionally and (2) Cerpa, Villegas and Martin acted without authority. Accordingly the motion for summary judgment is denied as to all three individual defendants on Jackson's state law claims.

## Conclusion

Defendants' motion for summary judgment is denied as to Count I against Cerpa and Villegas, Count II against Cerpa,

24

Villegas, Martin and Department and Count III against Department. Their motion is granted as to Count I against Martin only. This action is set for a status hearing at 9 a.m. August 26, 2010 to discuss the necessary procedures for bringing the case to trial as quickly as possible.

_____
Milton I. Shadur
Senior United States District Judge

Date: August 19, 2010