IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DARRYL W. JACKSON, et al., )
                           )
         Plaintiffs,       )
                           )
     v.                    )   No. 06 C 3676
                           )
PAUL CERPA, et al.,        )
                           )
         Defendants.       )

MEMORANDUM OPINION AND ORDER

This Court's March 1, 2011 memorandum opinion and order has dealt with the post-final-pretrial-order ("FPTO") motions in limine filed by plaintiffs Darryl Jackson ("Jackson") and DWJ Petroleum, Inc. ("DWJ") in their action against Paul Cerpa ("Cerpa"), Gilbert Villegas ("Villegas"), Timothy Martin ("Martin") and the Illinois Department of Transportation ("IDOT"). As forecast there, this memorandum opinion and order speaks to the nine motions in limine filed by those defendants.[1]

But before this opinion turns to parsing the individual motions, something must be said about the lack of a full understanding that some of the motions reflect as to a couple of the most basic principles of the law of evidence-- particularly the hearsay rule and the important distinction between the Fed. R. Evid. ("Evid. R.") 404(b) prohibition of propensity evidence

---

[1] Unlike the seven Jackson-DWJ motions, which were set out in a single document, each of the nine defense motions is separate and carries an individual docket number, so that this opinion will identify those numbers as well as the motion numbers themselves.

and the nonexclusive listing in that Rule of matters that are outside the scope of that prohibition. To choose the most conspicuous example, it is absurd for defense counsel to contend that testimony as to a defendant's use of the word "nigger" is necessarily both hearsay and barred by Rule 404(b).

Hearsay? Not if a statement of that nature can properly be ascribed to Cerpa, for example.[2] How better to evidence a defendant's intent (his or her mindset) in a race-discrimination case brought by an African-American than by a showing that the defendant employs that term? And as for prejudice, such evidence is of course prejudicial (as is all relevant evidence), but it must be remembered that Evid. R. 403's balancing test compares probative force with <u>unfair</u> prejudice. In this instance Motion 6 (Dkt. 160) seeks to bar:

> Any reference to, evidence about, or testimony regarding any of the individual defendants or other IDOT employees ever using the word <u>nigger</u> (hereafter the <u>N-word</u>).

In the blanket form in which that is framed, it would have to be denied out of hand.

True enough, Motion 6 properly quotes deposition excerpts that are classic examples of true hearsay--"X told me that he heard Cerpa refer to Jackson as a 'nigger pimp.'" But that appears to be tempered by the grudgingly inadequate statement of

---

[2] See Appendix.

admissibility that follows in Motion 6 at 5 (emphasis as to the word "might" added):

> If Mr. Buonaguidi had testified that he directly heard Mr. Cerpa utter the N-word, such testimony might be admissible as a statement by a party.

In all events, defendants' treatment of Evid. R. 404(b) is impermissibly restrictive.

In sum, Motion 6 is granted in part, but not in the expansive version claimed by defendants. And the foregoing discussion should be kept in mind as to defendants' otherwise overexpansive employment of the hearsay objection.

To return to defendants' motions in sequential order, Motion 1 (Dkt. 154) seeks to bar testimony by Brenda Gold ("Gold") on hearsay grounds. That motion is granted as to hearsay testimony of the classic nature already described, but plaintiffs' response correctly points out that defendants have not identified any proper predicate for excluding her testimony in its entirety. Admissibility of Gold's other testimony can best be addressed in the crucible of trial, so Motion 1 is granted only in the limited terms stated here, with further rulings to await trial.

Motion 2 (Dkt. 155) asks that testimony by Patricia Walker and Christie Means be barred. Plaintiffs' response disclaims any intention to call either of them in plaintiffs' case in chief, but it properly "reserve[s] the right to call either as rebuttal

witnesses or to impeach the testimony of any witness who makes statements that either Ms. Means or Ms. Walker can testify to be false, incomplete or matters about which the witness claims not to remember." So Motion 2 is granted as limited by plaintiffs' response.

Motion 3 (Dkt. 156) asks that "references to political connections" be barred. That seems unexceptionable on its face, but plaintiffs' response at 5 points (for example) to matters in that respect that may reasonably be viewed by a factfinding jury as bearing importantly on Villegas' credibility in the very areas that are at issue in this case. Hence defendants' Motion 3 is denied in its blanket form, and this Court will consider and rule on issues of relevance of such testimony during the trial.

In another instance of overbreadth, Motion 4 (Dkt. 157) seeks "to bar mention of defendants' 'Hispanic Agenda.'" Framing the subject in terms of that label appears to mischaracterize plaintiffs' goal somewhat. Certainly evidence that Cerpa and Villegas are both of Hispanic origin and that they sought to favor others who share that ancestry can be probative and relevant in a case that claims discrimination against African-Americans. But once again the most appropriate handling is to deny Motion 4 without prejudice to its reassertion as to matters of that nature that are sought to be introduced at trial.

Next, Motion 5 (Dkt. 158) seeks "to bar references to

4

disparate impact"--again an oversimplification. It is true that this Court's March 19, 2010 memorandum opinion and order (696 F.Supp.2d 962) barred plaintiffs' disparate impact <u>claim</u> of that nature, which had been advanced under state law, because of their failure to adduce the requisite statistical evidence. But such barring of a discrete claim of that nature does not foreclose the introduction of evidence of the nature set out in plaintiffs' response at 8-9. Once again, Motion 5 as framed is inappropriately overbroad, and it is denied in such global terms.

Motion 7 (Dkt. 162) seeks to bar testimony by Dante Buonaguidi ("Buonaguidi")--first to exclude him as a witness at all (Supporting Mem. 1-3) based on defense counsel's already-mentioned mistaken perspective as to Evid. R. 404(b) and, if unsuccessful in that attempt at total exclusion, on a number of individualized bases. Indeed, the extensive and extended nature of defendants' objections (comprising a 15-page memorandum plus five attached exhibits), which actually extend to arguing that because some of his testimony "appears to be erroneous" and because other testimony "is unsubstantiated and lacks indicia of reliability," this Court should act as a filter--that it should make the credibility determinations that are properly reserved for the factfinding jury--as a means of usurping that jury function.

What Motion 7 appears to reflect is the sense of defense

counsel that Buonaguidi is dangerous because he is hitting too close to home. This Court of course declines any invitation to keep probative and relevant evidence out of the case because of such fears about what the jury might make of it. Nor does it make or suggest any substantive views on the merits of the case, for that of course is not a proper function of motions in limine.

Accordingly this Court will not pick and choose as between the sharply differing perspectives advanced by defendants' motion and supporting memorandum on the one hand and plaintiffs' response on the other. Buonaguidi will not be barred altogether as a witness, and the particulars of any proposed testimony on his part will instead be evaluated at the time of trial.

Next, Motion 8 (Dkt. 164) seeks the exclusion of "[a]ny testimony or argument that Defendants violated federal transportation laws and regulations or IDOT's own internal policies and procedures." It is of course true that the existence of any such violations would not automatically correlate one to one with liability on race-discrimination grounds. But it is equally true that some such violations may be both probative and relevant as to the charges advanced by Jackson and DWJ.

Certainly to the extent that defendants did not conform to the legal or regulatory provisions defining their responsibilities in the DBE field, the factfinding jury could

6

rationally consider that as a factor in reaching its decision on the merits. As with defendants' other motions, Motion 8 presents another instance of overkill and is denied as presented.

Lastly, Motion 9 (Dkt. 166) advances a grab bag of other proposed exclusions. Because plaintiffs' response addresses only two of those, this Court will assume that the others are nonobjectionable and therefore grants them without discussion.

One of the objected-to items asserts that plaintiffs should be precluded from seeking any damages other than lost profits from the lost subcontracts, based on the unit price of $24.61 as stated by plaintiffs on their October 25, 2005 DBE Participation Statement. Plaintiffs persuasively respond that any such contention is in the category of an affirmative defense that should have been presented earlier, rather than via a post-FPTO motion in limine. Even apart from any arguments as to waiver or forfeiture, this Court expects the subject of recoverable damages to be dealt with in the jury instruction conference, and both sides should be prepared to present proposed instructions and supporting authorities at that time. Meanwhile the motion is denied.

As the other contested item posed by Motion 9, defense counsel seeks to exclude any evidence as to the suspension or decertification of another African-American-owned DBE, Rohar Trucking. Plaintiffs' counsel responds that such evidence is of

7

the circumstantial type that may be offered to demonstrate pretext. In this Court's August 19, 2010 memorandum opinion and order it said in part (730 F.Supp.2d 905, 915):

> Instead Cerpa and Villegas required only the two African-American firms (DWJ and Rohar) to demonstrate their capabilities in ways not required of other DBEs.

This Court has not changed its view, and the challenged evidence will be admitted.

## Conclusion

This opinion and its March 1 predecessor have addressed all of the parties' motions in limine. Here in brief are the rulings announced in this opinion:

1. Motions 1 (Dkt. 154) and 6 (Dkt. 160) are granted in part.

2. Motion 9 (Dkt. 166) is granted in part and denied in part.

3. Motion 2 (Dkt. 155) is granted as limited by plaintiffs' response.

4. Motions 7 (Dkt. 162) and 8 (Dkt. 164) are denied.

5. Motions 3 (Dkt. 156), 4 (Dkt. 157) and 5 (Dkt. 158) are denied as overbroad.

_____
Milton I. Shadur
Senior United States District Judge

Date: March 3, 2011

Appendix

Defendants' Motion 6 (Dkt. 160) has asserted a hearsay objection to plaintiffs' attempted attribution to defendant Cerpa of the use of the word "nigger"--most specifically, of his assertedly speaking of plaintiff Jackson as a "nigger pimp." And the text of this memorandum opinion and order has confirmed that such attribution by a witness who could say nothing more than "X told me" of that alleged event would be a "classic example of pure hearsay."

Defendants' submission in support of Motion 6 states that the "X" in this instance, according to Buonaguidi's deposition testimony, was former IDOT employee Mark Bennett ("Bennett")--but defendants have also tendered, as Ex. C to that submission, a declaration by Bennett in which he denies having made any such statement to Buonaguidi. And if those were indeed the only statements proffered for trial purposes, a hearsay objection would of course be sustained.

Suppose however (1) that Bennett were to be called by plaintiffs' counsel as a witness on matters relevant to the litigation, (2) that in the course of that examination plaintiffs' counsel were to ask whether Bennett had ever made such a statement to Buonaguidi and (3) that Bennett were to respond to that question with a denial (just as he has in the current defense-submitted declaration). Suppose further (1) that Buonaguidi were then called by plaintiffs' counsel to testify on

matters relevant to the litigation, (2) that one of the questions then posed to him was whether Bennett had indeed made the statement Buonaguidi has ascribed to him in the Buonaguidi deposition and (3) that Buonaguidi were to respond affirmatively to that question.

Under that scenario the Buonaguidi answer would impeach the earlier Bennett answer directly. Quaere whether that would operate to pose a credibility question that would permit the jury, if it so chose, to discredit Bennett's disclaimer and correspondingly to credit as a fact Cerpa's use of the highly derogatory term as evidence of his race-discriminatory mindset. In that situation the <u>fact</u> of the statement having been made by Cerpa would be nonhearsay.

It would seem that a full analysis of the hearsay issue would require the litigants' counsel to speak to the issue posed by this Appendix. Accordingly counsel are ordered to tender their respective submissions on the subject by filings made (supplemented by a delivery to this Court's chambers of paper copies of those submissions) on or before March 21, 2011.